**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

* * *

ALLAYAH THOMAS, *et al.*,

Plaintiffs,

v.

DANIEL WAYNE RUSSEL, *et al.*,

Defendants.

Case No. 3:24-CV-00357-MMD-CLB

**ORDER GRANTING PLAINTIFFS' MOTION TO AMEND AND DENYING PLAINTIFFS' MOTION TO SEAL**

[ECF Nos. 49, 50]

Before the Court is Plaintiff Allayah Thomas ("Thomas") and Michael Denard's ("Denard") ("collectively referred to as "Plaintiffs") motion for leave to file a first amended complaint ("FAC").[1] (ECF No. 49.) Also before the Court is Plaintiffs' motion for leave to file the FAC under seal.[2] (ECF No. 50.) For the reasons stated below, Plaintiffs' motion for leave to file a FAC, (ECF No. 49), is granted, and their motion for leave to file the FAC under seal, (ECF No. 50), is denied.

**I.    MOTION TO AMEND**

Plaintiffs filed a motion for leave to file an FAC to add a claim for punitive damages against Defendant Savage Services Corp. ("Savage") under NRS §§ 42.005, 42.007. (ECF No. 49.) Plaintiffs argue they are now able to allege facts sufficient to support a request for punitive damages based on facts learned in discovery. (*Id.*)

This case arises from a collision on August 12, 2022, on Interstate 80 ("I-80") near Carlin, Nevada. (ECF No. 49 at 3; ECF No. 53 at 2.) The collision involved a truck pulling two trailers, owned by Savage and operated by Savage's employee, Russel, and a Jeep passenger vehicle driven by Denard with Thomas as the front-seat passenger. (*Id.*)

In the FAC, Plaintiffs allege the following: Savage has a trucking operation with a

---

[1]    Defendants opposed, (ECF No. 53), and Plaintiffs replied, (ECF No. 54).

[2]    Defendants did not oppose.

transload facility in Elko, Nevada, where the primary source of revenue is delivering quicklime to commercial gold mines. (ECF No. 49-3 at 5.) Several days before the collision, the company providing the quicklime, Graymont, informed Savage that the primary site for loading quicklime, the Pilot Peak plant, would be reducing its quicklime production for repairs, beginning on August 15, 2022. (*Id.* at 5-6.) Graymont offers a "self-loading" certification that allows individuals to operate the loading equipment at the terminal without the presence of Graymont staff, who are only present from 8:00 A.M. through 5:00 P.M. on Monday through Friday. (*Id.* at 7.)

On August 11, 2022, the Pilot Peak plant had a power outage and could not produce quicklime. Consequently, on August 12, 2022, Savage routed its truck drivers to the backup loading site, located near Carlin, Nevada. (*Id.*) Savage Operations Manager Joe Reasbeck ("Reasbeck") sent day supervisor Lance Tracy ("Tracy") to supervise the loading of eight Savage trucks at the backup site near Carlin ("Carlin facility"). (*Id.* at 6.) Reasbeck also instructed Tracy to receive his self-loading certification. (*Id.* at 7.)

Tracy's position involved supervising the day-to-day activities of the Savage truck drivers when they loaded, transported, and delivered commodities. (*Id.* at 7.) Tracy "had complete authority over how to direct Savage drivers at loading terminals and mines, and to direct the detail of their work." (*Id.*) Reasbeck "delegated full authority to [] Tracy to control the Savage operations at the Carlin terminal" on August 12, 2022. (*Id.*)

On August 12, 2022, one of the two loading racks used to open and close the hatches on the trailers during the loading of quicklime was inoperable. (*Id.* at 7.) As a result, drivers needed to make two passes through the silo to close the hatches and secure the load of quicklime, which added significant time to the loading process. (*Id.* at 7-8.) Savage requires its drivers to receive training before using the Carlin facility to load and make deliveries. (*Id.* at 8.) However, on August 12, 2022, none of the eight Savage employees present at the Carlin facility had received such training. (*Id.*) Upon arriving, Tracy had to be trained on the procedures and then train the seven drivers. (*Id.*) Tracy

2

was also informed that he could not receive a self-loading certification that day because the certification was a three-day process. (*Id.* at 7.)

By the early afternoon, the situation at the Carlin facility became "chaotic" and Tracy called Reasbeck to tell him that it might be a good idea to stop loading trucks and return to the Carlin facility when the rack was fixed and the drivers had been better trained. (*Id.* at 9.) Reasbeck told Tracy to finish the job, to do everything he could to get self-loading certified, and to load as many trucks as possible before Graymont told them they needed to stop for the day. (*Id.* at 10.) Reasbeck then hung up the phone. (*Id.*)

One of the last drivers sent to the Carlin facility was Russel. (*Id.*) Once at the facility, Tracy and Russel decided to deviate from procedure to allow Russel to remain on the loading rack to open and close the hatches of every Savage truck, rather than the regular procedure of having each driver open and close their own hatches. (*Id.*) This decision was made to speed up the loading process in order to load as many trucks as possible before the Carlin facility closed. (*Id.*)

Around 5:00 P.M. on August 12, 2022, Graymont personnel informed Tracy that the last truck, Russel's truck, could not be loaded that day. (*Id.*) Tracy told Russel to switch trucks, so Russel would take Tracy's loaded truck and Tracy would take Russel's empty truck back to Elko. (*Id.*) Tracy handed Russel the bill of lading for the loaded truck, which is typically the last step in the loading process. (*Id.*) Russel then went into "autopilot" and began driving the truck, forgetting to take the loaded truck back through the silo for a second time to close the latches. (*Id.*) Russel drove the loaded truck away from the Carlin facility and onto I-80 with open latches. (*Id.*)

Tracy noticed quicklime powder blowing out of the truck as Russel pulled onto the I-80 onramp and called Russel to alert him. (*Id.* at 11.) Russel could see the Carlin facility, however, the next offramp on I-80 was at least 10 miles away. (*Id.*) Russel pulled onto the shoulder of I-80 to discuss his options with Tracy. (*Id.*) The two believed that a rainstorm was approaching and – mistakenly – believed that exposure of quicklime to water would cause an explosive chemical reaction. (*Id.*) Tracy therefore believed that

there was no time for Russel to drive slowly to the next exit and return to the Carlin facility and also rejected a plan to use safety equipment to close the latch on the shoulder of I-80. (*Id.* at 11-12.)

Tracy then instructed Russel to return to the Carlin facility immediately by performing a U-turn on I-80, without calling Reasbeck, anyone from Savage, or the Nevada Highway Patrol. (*Id.* at 12.) Before performing the U-turn, Russel was parked on the right shoulder of I-80 heading eastbound. (*Id.* at 12-13.) The eastbound and westbound lanes were separated by an 83-foot dirt median that contained clear and prominent signage indicating "AUTHORIZED VEHICLES ONLY" and "No U-Turns." (*Id.*) There are two lanes heading in both directions, each approximately 12 feet in width. (*Id.*)

Right before the collision, Denard was driving eastbound on I-80 in the lane closest to the median ("Lane 1"). (*Id.* at 13.) As Denard was approaching, Russel began merging from the shoulder into the lane furthest from the median ("Lane 2"). Denard believed that Russel was merging into Lane 2 to continue driving in that lane. (*Id.*) However, Russel started the U-turn and began to turn across Lane 1 aiming for the median, blocking both lanes of eastbound I-80. (*Id.*) Denard attempted to evade the truck and two trailers, which were nearly 100-foot-long, but was unsuccessful and struck the back of the truck. (*Id.*) The collision occurred in the median to the left of Lane 1. (*Id.*) At the time of the collision, both lanes were blocked by the trailers, with the second trailer still mostly in Lane 2. (*Id.*) Dashcam footage from the interior of Russel's truck showed that Russel saw Denard approaching. (*Id.* at 14.) Russel stated that he knew the U-turn might be an "inconvenience" for Denard but expected Denard to avoid the truck. (*Id.*)

### A.   Legal Standard

Federal Rule of Civil Procedure 15(a)(2) instructs that "[t]he court should freely give[] leave [to amend a pleading] when justice so requires." The Ninth Circuit has made clear Rule 15(a) permits liberal application. *Sonoma Cnty. Ass'n of Retired Emps. v. Sonoma Cnty.*, 708 F.3d 1109, 1117 (9th Cir. 2013). Under Rule 15(a), courts consider various factors, including: (1) bad faith; (2) undue delay; (3) prejudice to the opposing

party; (4) the futility of the amendment; and (5) whether the plaintiff has previously amended his complaint. *Desertrain v. City of Los Angeles*, 754 F.3d 1147, 1154 (9th Cir. 2014). The factors do not weigh equally; rather, prejudice receives the greatest weight. *Brown v. Stored Value Cards, Inc.*, 953 F.3d 567, 574 (9th Cir. 2020) (citing *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003)).

Defendants bear the burden of establishing prejudice, and absent its presence or a "strong showing" under the other factors, there is a presumption in favor of permitting amendment. *Eminence Cap., LLC*, 316 F.3d at 1052 (citing *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 186-87 (9th Cir. 1987)). When considering prejudice, the court may weigh against the movant the amended pleading's great alteration of the litigation's nature that requires the opposing party to defend against "different legal theories and . . . different facts." *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 953 (9th Cir. 2006) (internal quotation omitted). Alone, such alteration is not fatal. *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990).

By contrast, futility "alone can justify the denial of a motion for leave to amend." *Nunes v. Ashcroft*, 375 F.3d 805, 808 (9th Cir. 2003) (quoting *Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995)). Futility arises when the amendment is legally insufficient, *Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 656 (9th Cir. 2017), or where the amended complaint would be subject to dismissal, such as when it violates the statute of limitations. *Platt Elec. Supply, Inc. v. EOFF Elec., Inc.*, 522 F.3d 1049, 1060 (9th Cir. 2008).

**B.    Discussion**

Plaintiffs seek to amend their complaint to add the remedy of punitive damages under NRS §§ 42.005, 42.007. (*See* ECF No. 49.) Turning to the *Desertrain* factors, the Court finds that the proposed amendment is not brought with bad faith or undue delay. Plaintiffs filed the motion to amend on December 17, 2025, which was the last day to do so under the discovery plan and scheduling order. (*See* ECF Nos. 48, 49.) The proposed FAC is based on information learned during discovery, and therefore Plaintiffs neither

knew nor should have known the facts and theories raised by the amendment in the original pleading. *AmerisourceBergen*, 465 F.3d at 953 (citing *Jackson v. Bank of Hawaii,* 902 F.2d 1385, 1388 (9th Cir. 1990)). The FAC does not greatly alter the nature of the litigation or add parties or claims, but rather only adds the remedy of punitive damages. *Id.* Furthermore, Plaintiffs have not previously amended their complaint. *Desertrain*, 754 F.3d at 1154. Defendants have also failed to meet their burden of establishing that allowing amendment would be prejudicial, meaning there is a presumption in favor of permitting amendment.[3] *Eminence Cap., LLC*, 316 F.3d at 1052.

The Court will now turn to the final *Desertrain* factor, whether the proposed amendment would be futile. *Desertrain*, 754 F.3d at 1154. Plaintiffs argue they are entitled to punitive damages under all three subsections of NRS 42.007(1). (ECF No. 49 at 10-15.) Defendants argue that Plaintiffs are not entitled to punitive damages under any subsection of NRS 42.007(1) but, even if they were, Tracy was not a managing agent of Savage. (ECF No. 53 at 10-16.)

NRS 42.005(1) provides that a plaintiff may recover punitive damages upon proving by clear and convincing evidence that the defendant is "guilty of oppression, fraud or malice, express or implied." "'Oppression' means despicable conduct that subjects a person to cruel and unjust hardship with conscious disregard of the rights of the person." NRS 42.001(4). "'Fraud' means an intentional misrepresentation, deception or concealment of a material fact known to the person with the intent to deprive another person of his or her rights or property or to otherwise injure another person." NRS 42.001(2). "'Malice, express or implied' means conduct which is intended to injure a person or despicable conduct which is engaged in with a conscious disregard of the rights or safety of others." NRS 42.001(3). A defendant acts with conscious disregard when he or she has "knowledge of the probable harmful consequences of a wrongful act and . . . willful[ly] and deliberate[ly] fail[s] to act to avoid those consequences." NRS

---

[3]     Defendants do not argue that the proposed amendment would be prejudicial, but rather solely argue that the amendment would be futile. (*See* ECF No. 53.)

42.001(1). "In other words, under NRS 42.001(1), to justify punitive damages, the defendant's conduct must have exceeded mere recklessness or gross negligence." *Wyeth v. Rowatt*, 244 P.3d 765, 783 (Nev. 2010) (emphasis added) (internal quotation omitted).

NRS 42.007 outlines the conditions for finding an employer liable for punitive damages:

(1)   Except as otherwise provided in subsection 2, in an action for the breach of an obligation in which exemplary or punitive damages are sought pursuant to subsection 1 of NRS 42.005 from an employer for the wrongful act of his or her employee, the employer is not liable for the exemplary or punitive damages unless:

(a)   The employer had advance knowledge that the employee was unfit for the purposes of the employment and employed the employee with a conscious disregard of the rights or safety of others;

(b)   The employer expressly authorized or ratified the wrongful act of the employee for which the damages are awarded; or

(c)   The employer is personally guilty of oppression, fraud or malice, express or implied.

If the employer is a corporation, the employer is not liable for exemplary or punitive damages unless the elements of paragraph (a), (b) or (c) are met by an officer, director or managing agent of the corporation who was expressly authorized to direct or ratify the employee's conduct on behalf of the corporation.

Although NRS 42.007 fails to define a managing agent, the Nevada Supreme Court has recognized that "determining an individual's managerial capacity depends on 'what the individual is authorized to do by the principal and whether the agent has the discretion as to what is done and how it is done.'" *Countrywide Home Loans, Inc. v. Thitchener*, 192 P.3d 243, 258 (Nev. 2008) (quoting *Smith's Food & Drug Centers v. Bellegarde*, 958 P.2d 1208, 1214 (Nev. 1998) (overruled on other grounds)). Determining who is a managing agent does not turn on the employee's title as a manager or supervisor. *Nittinger v. Holman*, 119 Nev. 192, 69 P.3d 688, 691-92 (Nev. 2003) (en banc). Rather, an employee is a managing agent if the employee has discretion and control over an area of the business sufficient to set policy for the business. *Id.* Where an employee does not have discretion to deviate from established policy, that employee

7

is not a managing agent. *Id.* at 692.

Plaintiffs argue they have sufficiently alleged that Tracy was a managing agent because they allege Tracy "had complete authority over how to direct Savage drivers at loading terminals and mines, and to direct the detail of their work[,]" and that Reasbeck "delegated full authority to [] Tracy to control the Savage operations at the Carlin terminal" on August 12, 2022. (ECF No. 49 at 13-14.) Plaintiffs further argue Tracy was able to — and did — deviate from normal procedures by having Russel open and close the latches on all of the trucks instead of having each driver adjust the latches, having Russel switch trucks with Tracy, and by directing Russel to perform the U-turn without seeking or receiving approval from any supervisors. (*Id.* at 14.) Based on these allegations, the Court finds Plaintiffs have sufficiently alleged Tracy was a managing agent because he had discretion and control over the loading of the trucks, including the discretion to deviate from set policy. *Nittinger*, 69 P.3d 688, 691-92; *see Terrell v. Cent. Washington Asphalt, Inc.*, 168 F. Supp. 3d 1302, 1319 (D. Nev. 2016) (finding that an individual was a managing agent for the purposes of NRS 42.007(1) where the individual was responsible for the day-to-day operations of company's commercial motor vehicle drivers and was given discretion over how to monitor and enforce compliance with safety regulations for the company's trucking operations).

Defendants next argue Plaintiffs did not sufficiently allege facts to show they are entitled to damages under all three subsections of NRS 42.007(1). (ECF No. 53 at 5-16.) For a motion to amend, Plaintiffs only need to show they are entitled to punitive damages under any of the three subsections to show that amendment would not be futile. For NRS 42.007(1)(b), Defendants argue Plaintiffs cannot show Savage expressly authorized or ratified the wrongful act because Tracy is not a managing agent. (ECF No. 53 at 15.) However, as explained above, the Court finds Plaintiffs have sufficiently alleged Tracy is a managing agent. As Plaintiffs also alleged Tracy directed Russel to perform the u-turn, Plaintiffs have sufficiently pled Savage, through Tracy, expressly authorized or ratified the wrongful act of the employee, Russel. Therefore, Plaintiffs have sufficiently pled facts

to show they are entitled to punitive damages under NRS 42.007(1)(b).

Finally, Defendants argue Plaintiffs' proposed amendment is futile because they are precluded from recovering punitive damages for negligence claims. (ECF No. 53 at 16.) Generally, a plaintiff is not entitled to pursue punitive damages on negligence claims. *See Countrywide*, 192 P.3d at 255 (noting that the definitions in NRS 42.001 "denote[ ] conduct that, at a minimum, must exceed mere recklessness or gross negligence."); *McConnell v. Estes Express Lines, Inc.*, No. 2:23-CV-01227-GMN-NJK, 2024 WL 3639918, at *2 (D. Nev. July 31, 2024) (dismissing request for punitive damages in negligence case without prejudice "[b]ecause Plaintiff may be able to plead additional facts warranting punitive damages[.]"); *see also Madrigal v. Treasure Island Corp*, No. 2:08-cv-01243-PMP-GWF, 2008 WL 11389168, at *4 (D Nev. Dec. 30, 2008) (recognizing that evidence beyond mere negligence such as "unusual and serious circumstances of oppression, hardship, and injury" must exist to support a punitive damages award) (quoting *Forrester v. Southern Pacific Co.*, 134 P. 753, 769 (Nev. 1913)).

In this case, the Court finds Plaintiffs have alleged "unusual and serious circumstances of oppression, hardship, and injury" needed to raise Defendant's conduct to the level of malice required for punitive damages in negligence claims. *Madrigal*, 2008 WL 11389168, at *4; *see Countrywide*, 192 P.3d at 255. Here, Plaintiffs have alleged Tracy directed Russel to perform the U-turn, rather than drive to the next exit, and Russel actually saw Denard's car in the rearview mirror before attempting the U-turn. The Court finds, when taking the factual allegations in the FAC as true, a juror could reasonably conclude Defendants committed "despicable conduct that subjects a person to cruel and unjust hardship with conscious disregard of the rights of the person." NRS 42.001(4). While Plaintiffs bring only claims for negligence, the Court finds the factual allegations, when taken as true, would support a finding that Defendants' actions constituted more than mere recklessness or gross negligence. Thus, at the motion to amend stage, the Court finds a request for punitive damages is not futile. *Desertrain*, 754 F.3d at 1154.

Consequently, having found all *Desertrain* factors weigh in favor of amendment, Plaintiff's motion for leave to file an FAC is granted.

## II.      MOTION TO SEAL

The Court will now address Plaintiffs' motion to file the FAC under seal. (ECF No. 50.) "The courts of this country recognize a general right to inspect and copy public records and documents, including judicial records and documents." *Courthouse News Serv. v. Planet*, 947 F.3d 581, 591 (9th Cir. 2020) (quoting *Courthouse News Serv. v. Brown*, 908 F.3d 1063, 1069 (7th Cir. 2018)). Certain documents are exceptions to this right and are generally kept secret for policy reasons, including grand jury transcripts and warrant materials in a pre-indictment investigation. *Kamakana v. City & Cnty. Of Honolulu,* 447 F.3d 1172, 1178 (9th Cir. 2006).

If a party seeks to file a document under seal, there are two possible standards the party must address: the compelling reasons standard or the good cause standard. *See Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1096-97 (9th Cir. 2016). The choice between the two standards depends on whether the documents proposed for sealing accompany a motion that is "more than tangentially related" to the merits of the case. *Id.* at 1099. If it is more than tangentially related, the compelling reasons standard applies. If not, the good cause standard applies. *Id.* at 1102.

Here, Plaintiffs seek to file exhibits under seal in connection with the motion to file an amended complaint, which are "more than tangentially related" to the merits of a case. Therefore, the compelling reasons standard applies.

Under the compelling reasons standard, "a court may seal records only when it finds 'a compelling reason and articulate[s] the factual basis for its ruling, without relying on hypothesis or conjecture.'" *United States v. Carpenter*, 923 F.3d 1172, 1179 (9th Cir. 2019) (quoting *Ctr. for Auto Safety*, 809 F.3d at 1096-97) (alteration in original). Finding a compelling reason is "best left to the sound discretion" of the Court. *Ctr. for Auto Safety*, 809 F.3d at 1097 (quoting *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 599 (1978)).

Plaintiffs' one-page motion to seal explains that Plaintiffs filed the motion based

on the parties' stipulated protective order, (ECF No. 26). (ECF No. 50.) Plaintiffs state that although they "dispute and have challenged the propriety of Defendants' confidentiality designations, and do not believe that any part of the FAC should remain under seal, it is Plaintiffs' understanding that the material must be treated as confidential until the Court has ruled on the issue." (*Id.*) Plaintiffs conclude by stating that, per the protective order, "the burden remains with the Defendants to show why any portion of the FAC should remain under seal." (*Id.* (citing ECF No. 26 at 4.) Defendants did not respond, and Plaintiffs do not otherwise explain why the FAC should be filed under seal. (*See id.*)

Consequently, as the parties fail to provide a basis for sealing the FAC, the Court cannot find that compelling reasons support granting the motion to seal. *Carpenter*, 923 F.3d at 1179. Therefore, Plaintiffs' motion to seal is denied.

**III.    CONLCUSION**

**IT IS THEREFORE ORDERED** that Plaintiffs' motion for leave to file an FAC, (ECF No. 49), is **GRANTED**.

**IT IS FURTHER ORDERED** that Plaintiff's motion for leave to file the proposed FAC under seal, (ECF No. 50), is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiffs shall file an unredacted version of their proposed FAC.

**DATED**: February 20, 2026.

**UNITED STATES MAGISTRATE JUDGE**

11